Filed 12/10/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JAMES ACRES,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>LESTER MARSTON et al.,<br><br>      Defendants and Respondents. | C089344<br><br>(Super. Ct. No. 34-2018-00236829-CU-PO-GDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge.  Reversed in part and affirmed in part.

James Acres, in pro. per., for Plaintiff and Appellant.

Forman & Associates, George Forman, Jay B. Shapiro and Margaret C. Rosenfeld for Defendants and Respondents Arla Ramsey, Anita Huff, Thomas Frank, Lester Marston, Rapport and Marston, David Rapport, Darcy Vaughn, Ashley Burrell, Cooper DeMarse and Kostan Lathouris.
Lerch Sturmer, Jerome N. Lerch, Debra Sturmer and Nicole A. Deterding for Defendants and Respondents Boutin Jones, Inc., Michael Chase, Daniel Stouder and Amy O'Neill.
Berman Berman Berman Schneider & Lowary and Howard J. Smith for Defendants and Respondents Janssen Malloy LLP, Megan Yarnall and Amelia Burroughs.

Gordon Rees Scully Mansukhani, Kevin W. Alexander and Allison L. Jones for Defendants and Respondents Lester Marston, Ashley Burrell, Cooper DeMarse and Darcy Vaughn.

THE COURT:

It is ordered that the opinion filed herein on November 18, 2021, be modified as follows:

On page 36, the following section titled "*IV. Leave to Amend*" is added to proceed after the section entitled "*B. Prosecutorial and Similar Immunity for Government Attorneys*":

IV

*Leave to Amend*

Lastly, we turn to Acres's contention that the trial court wrongly granted respondents' motions to quash without giving him leave to amend his complaint. Acres asserts that he should be granted leave to amend his complaint for five reasons. First, he argues that he should have leave to amend his complaint "to attack Respondents' entitlement to sovereign immunity." Second, he asserts that his "complaint could be amended to name Blue Lake Casino as a defendant," which, he states, might not have sovereign immunity. Third, he contends his complaint "could be amended" to add causes of action under the Racketeer Influenced and Corrupt Organizations Act (RICO). In support, he cites a federal district court decision that allowed a plaintiff to pursue a RICO claim against several defendants who had unsuccessfully claimed sovereign immunity. (*JW Gaming Development, LLC v. James* (N.D. Cal., Oct. 5, 2018, No. 3:18-CV-02669-WHO) 2018 WL 4853222 at pp. *3-*4, *aff'd* (9th Cir. 2019) 778 Fed. Appx. 545.) Fourth, he asserts the "complaint could be amended to show Judge Marston negotiated with the State of California on Blue Lake's behalf while he presided over *Blue Lake v. Acres* [*Bonusing*]." He then claims that "[t]here is a reasonable possibility the inclusion of these allegations will defeat Respondents' claims of judicial immunity." And fifth, he

contends the "complaint could be amended to allege criminal causes of action," which, he argues, "would not be protected by tribal sovereign immunity."

But of all these claims, we find it necessary to address only one—the fourth. Acres, again, asserts that "Respondents' claims of judicial immunity" might be defeated if his complaint were amended to note that Judge Marston represented the Tribe at the time of *Blue Lake v. Acres Bonusing*. We disagree. As discussed above, even if Judge Marston had a conflict of interest and a corrupt intent when he presided over *Blue Lake v. Acres Bonusing*, that would still not be ground for finding him liable for damages. (See *Stump, supra*, 435 U.S. at pp. 355-356 [judges " 'are not liable to civil actions for their judicial acts, even when such acts . . . are alleged to have been done maliciously or corruptly' "].) Because Acres's proposed amendment would thus be futile in overcoming Judge Marston's claim of judicial immunity, we decline to find that he should be granted leave to amend his complaint in this respect. (*Nelson v. Tucker Ellis, LLP* (2020) 48 Cal.App.5th 827, 848 [" ' "[L]eave to amend should *not* be granted where . . . amendment would be futile." ' "].)

All Acres's remaining contentions—the first, second, third, and fifth—appear to be directed toward overcoming respondents' claimed entitlement to sovereign immunity. But because, for the reasons already discussed, we agree that respondents are not entitled to sovereign immunity, we find it unnecessary to address these arguments here.

There is no change in the judgment. The petition for rehearing is denied.

BY THE COURT:


_____\s\_____
BLEASE, Acting P. J.

3

We concur:

_____\s_____
MAURO, J.

_____\s_____
DUARTE, J.

4

Filed 11/18/21 (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JAMES ACRES,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>LESTER MARSTON et al.,<br><br>      Defendants and Respondents. | C089344<br><br>(Super. Ct. No. 34-2018-00236829-CU-PO-GDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge. Reversed in part and affirmed in part.

James Acres, in pro. per., for Plaintiff and Appellant.

Forman & Associates, George Forman, Jay B. Shapiro, Margaret C. Rosenfeld for Defendants and Respondents Arla Ramsey, Anita Huff, Thomas Frank, Lester Marston, Rapport and Marston, David Rapport, Darcy Vaughn, Ashley Burrell, Cooper DeMarse, and Kostan Lathouris.

Lerch Sturmer, Jerome N. Lerch, Debra Sturmer, Nicole A. Deterding for Defendants and Respondents Boutin Jones, Inc., Michael Chase, Daniel Stouder, and Amy O'Neill.

Berman Berman Berman Schneider & Lowary, Howard J. Smith for Defendants and Respondents Janssen Malloy LLP, Megan Yarnall, and Amelia Burroughs.

Gordon Rees Scully Mansukhani, Kevin W. Alexander, Allison L. Jones for Defendants and Respondents Lester Marston, Ashley Burrell, Cooper DeMarse, and Darcy Vaughn.

1

Suits against Indian tribes (and other sovereign entities) are generally barred by sovereign immunity. So too are some suits against tribal employees, though not because these employees enjoy sovereign immunity by virtue of their position. These suits are instead barred by sovereign immunity because, although nominally directed against an employee, they are really against the tribe. To determine the true defendant in these cases, courts focus on the remedy the plaintiff seeks. A suit against a tribal employee is really against the tribe if the plaintiff's requested relief must necessarily come from the tribe itself. But if, on the other hand, the plaintiff's suit would only impose personal liability on the sued employee, then the suit is, as pleaded, against the individual alone and sovereign immunity is inapplicable.

This case concerns the aftermath of an Indian tribal casino's unsuccessful suit in tribal court against appellant James Acres following a contract dispute. After dismissal of the tribal case, Acres filed his own suit in state court against two officials of the casino, the casino's attorneys, a tribal court judge, the clerk of the tribal court, and various other individuals and entities. He alleged, among other things, that the parties he sued (collectively, respondents) wrongfully conspired to file the lawsuit against him in tribal court. He then sought monetary relief from respondents as redress for this alleged conduct. The trial court, however, found Acres's claims against all respondents barred by sovereign immunity and, as to the tribal judge and several others, also barred by judicial or quasi-judicial immunity.

On appeal, we reverse in part. Because Acres's suit, if successful, would bind only the individual respondents, and not the tribe or its casino, we find these respondents are not entitled to sovereign immunity. But, as to those respondents who have asserted personal immunity from suit (e.g., judicial immunity), we agree those respondents, with one exception, are immune from suit.

2

BACKGROUND

I

*Tribal Casino's Suit Against Acres*

Acres is the owner of Acres Bonusing Inc., a Nevada gaming company. In 2010, Acres Bonusing entered into an agreement with Blue Lake Casino & Hotel (the Casino), an arm of Blue Lake Rancheria (the Tribe), which is a federally recognized tribe. Under the agreement, Acres Bonusing agreed to lease to the Casino a gaming software that would allow Casino patrons to gamble on tablet computers and other handheld devices, and the Casino, in exchange, agreed to pay a monthly lease fee and a $250,000 advance deposit. In 2010, according to Acres, the Casino used the gaming software on 56 devices and, in 2011, the Casino expanded the use of the software to 88 devices.

But a few years later, in 2015, the Casino sought a return of the $250,000 advance deposit with interest. After Acres Bonusing declined to pay this amount, the Casino sued Acres Bonusing and Acres in tribal court, alleging, among other things, that Acres Bonusing and Acres knew their gaming "system could never satisfactorily perform" and failed to supply "new, more successful games to [the Casino] as required by the Agreement and as promised."

Lester Marston, a tribal judge, initially presided over the case, which was titled *Blue Lake Casino & Hotel v. Acres Bonusing* (*Blue Lake v. Acres Bonusing*). At the time he presided over the case, Judge Marston also represented the Casino as its attorney in several matters.[1]

---

[1] To support his contention that Judge Marston served as the Casino's attorney at the time of *Blue Lake v. Acres Bonusing*, Acres asks that we take judicial notice of several documents purportedly showing that Judge Marston represented the Casino in negotiations with the State of California in 2015. We deny the request. No one in this appeal disputes that Judge Marston served as the Casino's attorney on some matters around the time of *Blue Lake v. Acres Bonusing*. The parties instead, accepting these

3

In 2016, Acres moved to disqualify Judge Marston but Judge Marston denied the motion. Around the same time, Acres also filed "two federal court actions asserting that the tribal court lacked jurisdiction over him." (*Acres Bonusing, Inc. v. Marston* (N.D.Cal., Apr. 15, 2020, No. 19-CV-05418-WHO) 2020 WL 1877711 at p. *2 (*Acres Bonusing*).) The federal district court dismissed the first action for lack of subject matter jurisdiction because, before challenging a tribal court's jurisdiction, a party generally must first exhaust tribal remedies, and Acres had not done so. (*Acres v. Blue Lake Rancheria Tribal Court* (N.D.Cal., Aug. 10, 2016, No. 16-CV-02622-WHO) 2016 WL 4208328, at pp. *2-*4 (*Acres I*).) The court acknowledged several exceptions exist to the exhaustion requirement, including when tribal court jurisdiction is asserted in bad faith, but it found Acres failed to show any of these exceptions applicable. (*Ibid.*)

The following month, Acres filed his second action in federal court and, this time, the court agreed to allow Acres "limited discovery on the issue of bad faith." (*Acres v. Blue Lake Rancheria* (N.D.Cal., Feb. 24, 2017, No. 16-CV-05391-WHO) 2017 WL 733114, at p. *1 (*Acres II*).) The court did so in part based on inconsistent declarations that Judge Marston had filed in this federal action and in other litigation involving the Tribe, which the court found "concern[ing]." (*Ibid.*) In this federal action, Judge Marston filed a declaration claiming he was "not the Tribe's Tribal Attorney," but in another ongoing case titled *Blue Lake Rancheria v. Shiomoto*, Judge Marston filed a declaration saying he was "the attorney for . . . the Blue Lake Rancheria ('Tribe') . . . and Arla Ramsey." (*Ibid.*)

Shortly after the district court's ruling, Judge Marston recused himself from *Blue Lake v. Acres Bonusing* and appointed James Lambden, a retired California Court of Appeal justice, to preside over the case. A few months later, following Acres's filing of

---

allegations as true, dispute whether Judge Marston may nonetheless be immune from suit. Because Acres's request is irrelevant to the issue of immunity, we deny it.

various motions, Judge Lambden dismissed Acres from *Blue Lake v. Acres Bonusing*. He reasoned that the Casino's one claim against Acres "essentially" concerned Acres's statement that the gaming system would be profitable, which was not "an actionable misstatement of the facts regarding the performance of the [system]." The Casino afterward dismissed its action against Acres Bonusing.

## II

### *Acres's Suit*

In 2018, about a year after the Casino dismissed its tribal action, Acres filed suit in state court against seventeen individuals and entities involved in the tribal litigation. In particular, he sued two officials of the Casino and the Tribe (Arla Ramsey and Thomas Frank), the Casino's attorneys in *Blue Lake v. Acres Bonusing* (Boutin Jones Inc. and three associated attorneys (Michael Chase, Daniel Stouder, and Amy O'Neill)) and Janssen Malloy LLP and two associated attorneys (Megan Yarnall and Amelia Burroughs)), the clerk of the tribal court (Anita Huff), Judge Marston, an "association of attorneys" called Rapport and Marston, and several attorneys associated with Rapport and Marston (David Rapport, Cooper DeMarse, Ashley Burrell, Darcy Vaughn, and Kostan Lathouris).

According to Acres's complaint, Boutin Jones, Janssen Malloy, Chase, Stouder, O'Neill, Yarnall, and Burroughs all represented the Casino, at one point or another, in *Blue Lake v. Acres Bonusing*. Boutin Jones, Chase, Stouder, and O'Neill also represented the Casino in *Acres I* and *Acres II*. Judge Marson initially presided over *Blue Lake v. Acres Bonusing* and, while doing so, also served as the Casino's attorneys on various matters. Huff was the clerk of the tribal court and also a manager at the Casino during the tribal court litigation. Ramsey, among other things, was the chief executive officer of the Casino and "supervised the work of Clerk Huff" during the tribal court litigation. Frank verified the Casino's discovery in *Blue Lake v. Acres Bonusing* and "has sworn statements describing his employment in various executive roles for [the Casino] over the

5

past 15 years." And, rounding out the named respondents, Rapport and Marston is an "association of attorneys" that includes Judge Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris. Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris, Acres alleged, provided legal services to the Casino and the Tribe in various matters unrelated to Acres around the time of *Blue Lake v. Acres Bonusing*, and also, at least potentially, provided legal services to the Casino in *Acres I* and *Acres II*. DeMarse, Burrell, Vaughn, and Lathouris, Acres further asserted, also provided legal services to Judge Marston in his role as judge in *Blue Lake v. Acres Bonusing*.

Acres raised seven claims in his complaint. He alleged: (1) the two Casino officials, Boutin Jones and its associated attorneys (apart from Chase), and Janssen Malloy and its associated attorneys wrongfully filed the tribal lawsuit against him; (2) Judge Marston, Huff, Chase, Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris conspired to wrongfully file the tribal lawsuit; (3) the same respondents named in the second cause of action aided and abetted the wrongful filing of the tribal lawsuit; (4) Judge Marson breached the fiduciary duty he owed Acres when, among other things, he declined to disclose his work on behalf of the Casino and failed to recuse himself; (5) Judge Marston, Huff, the two Casino officials, Boutin Jones and its associated attorneys, Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris aided and abetted Judge Marston's breach of fiduciary duty; (6) Judge Marston committed constructive fraud by improperly "receiving compensation from [the Tribe], Blue Lake Casino, or Ms. Ramsey" while presiding over *Blue Lake v. Acres Bonusing*; and (7) Huff, the two Casino officials, Boutin Jones and its associated attorneys, Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris aided and abetted the constructive fraud.

As relief, Acres sought, among other things, damages for the injuries he suffered to his "body" and "his nervous system and person" from respondents' conduct and damages for "[t]he work required to uncover the true nature of Judge Marston's

6

relationship with [the Tribe], Blue Lake Casino, and Ms. Ramsey." He also sought to recover, for himself, any compensation that respondents had received for their services from the Tribe, the Casino, Ramsey, and "any related entity" since August 1, 2015.

Respondents afterward moved to quash Acres's summons and dismiss his suit. Frank, Boutin Jones and its associated attorneys, and Janssen Malloy and its associated attorneys contended Acres's suit against them was barred by sovereign immunity. Ramsey and Judge Marston contended Acres's suit against them was barred by sovereign immunity or, alternatively, by judicial or quasi-judicial immunity. Rapport and Marston and Rapport contended Acres's suit against them was barred by sovereign immunity or, alternatively, by prosecutorial immunity. And DeMarse, Burrell, Vaughn, and Lathouris contended Acres's suit against them was barred by sovereign immunity, or, alternatively, by prosecutorial immunity and judicial or quasi-judicial immunity.

The trial court granted respondents' motions, finding all respondents were entitled to sovereign immunity. As part of its reasoning, the court noted that it found "no evidence that the moving defendants acted in their individual capacities for their own private purposes and benefit, or outside the scope of their legal agency, authority and fiduciary duty to the Tribe as tribal officials." It then concluded that "[a]llowing the action to proceed against the Tribe's attorneys would undoubtedly require the Tribe to act, and would entangle this court in questions of Tribal Court practice and law that would directly impinge the Tribe's sovereignty." The court further found several of the respondents were also entitled to judicial or quasi-judicial immunity. It reasoned that "all of the alleged acts by the moving defendants with judicial roles (all except Ramsey and Rapport) were either judicial or quasi-judicial acts" performed within the tribal court's jurisdiction and so were protected by judicial immunity.

Several months after the court's ruling, Acres filed a similar suit in federal court. But that court too, for largely the same reasons, dismissed Acres's suit. It found Acres's suit against all respondents was barred by sovereign immunity. (*Acres Bonusing, supra,*

7

2020 WL 1877711 at pp. *6-*8.)  And it found Acres's suit against those respondents "with judicial roles" was further barred by judicial or quasi-judicial immunity.  (*Id.* at p. *9.)

Acres timely appealed the trial court's ruling.  Shortly after, he also appealed the federal district court's ruling in *Acres Bonusing*.

DISCUSSION

I

*Background Principles*

Indian tribes are sovereign nations "pre-existing the Constitution."  (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 56.)  Although once "separate nations within what is now the United States," they are now considered " 'domestic dependent nations.' "  (*Williams v. Lee* (1959) 358 U.S. 217, 218; *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma* (1991) 498 U.S. 505, 509.)  As domestic dependent nations, they " 'retain[] their original natural rights' in matters of local self-government" subject to Congress's "plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." (*Santa Clara Pueblo*, at pp. 55-56.)

"Among the core aspects of sovereignty that tribes possess—subject, again, to congressional action—is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.' "  (*Michigan v. Bay Mills Indian Community* (2014) 572 U.S. 782, 788.)  A tribe's sovereign immunity is generally implicated when a litigant sues the tribe or an arm of the tribe directly.  (See *Lewis v. Clarke* (2017) 137 S.Ct. 1285, 1290-1291 (*Lewis*) ["an arm or instrumentality of the [sovereign] generally enjoys the same immunity as the sovereign itself"].)  But it may also be implicated when a litigant sues a tribe's employees or officials.  Courts, in these circumstances, consider whether the suit, although nominally against an employee or official, is really against the sovereign.  "In making this assessment, courts may not simply rely on the characterization of the parties

8

in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." (*Id.* at p. 1291.)

A suit against a tribal official is really against the sovereign (and considered an official-capacity suit) if the plaintiff "must look to the [tribal] entity itself" for relief. (*Kentucky v. Graham* (1985) 473 U.S. 159, 166 (*Graham*) [discussing state sovereign immunity]; see also *Lewis, supra*, 137 S.Ct. at pp. 1290-1291 [applying the same principles when discussing tribal sovereign immunity].) That was true, for example, in *Edelman v. Jordan* (1974) 415 U.S. 651, 653. The plaintiff there sued state officials alleging that they administered a federal aid program in violation of federal law and, as relief, sought an injunction requiring the defendants to deliver the benefits wrongly withheld. (*Id.* at pp. 653-656.) In finding the suit barred by the state's sovereign immunity, the Supreme Court observed that the requested "funds w[ould] obviously not be paid out of the pocket of [defendant] Edelman" but would instead "inevitably come from the general revenues of the State of Illinois." (*Id.* at pp. 664-665.) The court thus found the requested "award resembles far more closely [a] monetary award against the State itself" and was barred by sovereign immunity. (*Id.* at pp. 665, 678; see also *Ford Motor Co. v. Department of Treasury of State of Indiana* (1945) 323 U.S. 459, 464 ["when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants"], overruled on other grounds by *Lapides v. Board of Regents of University System of Georgia* (2002) 535 U.S. 613.)

A suit against a tribal official, on the other hand, is against only the individual (and considered a personal-capacity suit) if the plaintiff's suit would only impose personal liability on the sued employee. (*Lewis, supra*, 137 S.Ct. at p. 1292 [" 'Personal-capacity suits . . . seek to impose *individual* liability upon a government officer for actions taken under color of state law' "].) *Lewis* is an example of a personal-capacity

9

suit. In that case, an employee of an arm of an Indian tribe rear-ended a car while driving patrons of the tribe's casino to their homes. (*Id.* at p. 1287.) The driver and passenger of the hit car afterward sued the employee in his individual capacity in Connecticut state court and, in response, the employee "moved to dismiss for lack of subject-matter jurisdiction on the basis of tribal sovereign immunity." (*Id.* at p. 1290.) He "argued that because [his employer] was entitled to sovereign immunity, he, an employee . . . acting within the scope of his employment at the time of the accident, was similarly entitled to sovereign immunity against suit." (*Ibid.*) Although the Connecticut Supreme Court accepted this argument, the Supreme Court reversed. "The critical inquiry," the court explained, "is who may be legally bound by the court's adverse judgment." (*Id.* at pp. 1293-1294.) And because a judgment against the employee in this case would "not bind the Tribe or its instrumentalities in any way," the court declined to find that sovereign immunity applied. (*Id.* at p. 1294; see also *Philadelphia Co. v. Stimson* (1912) 223 U.S. 605, 619-620 ["The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded]."])

Although tribal officials sued in their individual capacities cannot seek protection under the tribe's sovereign immunity, they may nonetheless be immune from suit under the distinct defense of official (or personal) immunity. Courts have long recognized that, under common law rules, "government officials are entitled to some form of immunity from suits for civil damages." (*Nixon v. Fitzgerald* (1982) 457 U.S. 731, 744.) This "immunity of government officers from personal liability," the Supreme Court has explained, "springs from the same root considerations that generated the doctrine of sovereign immunity." (*Scheuer v. Rhodes* (1974) 416 U.S. 232, 239 (*Scheuer*), abrogated on other grounds as stated in *Davis v. Scherer* (1984) 468 U.S. 183, 191.) In particular, the court noted, "[t]his official immunity apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith,

10

of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; [and] (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." (*Scheuer*, at pp. 239-240, fn. omitted.)

Courts have recognized two general forms of common law personal immunity: absolute immunity and qualified immunity. (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 807.) Government officials entitled to absolute immunity include "legislators, in their legislative functions," "judges, in their judicial functions," "prosecutors and similar officials," "executive officers engaged in adjudicative functions," and "the President of the United States." (*Ibid.*) Outside of those particular functions, government officials are generally entitled only to qualified immunity, which "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." (*Brosseau v. Haugen* (2004) 543 U.S. 194, 198; see *Buckley v. Fitzsimmons* (1993) 509 U.S. 259, 268 ["Most public officials are entitled only to qualified immunity."].)

Apart from common law personal immunity, tribal employees also enjoy statutory immunity under certain circumstances. (See, e.g., 25 U.S.C. § 5321(d) [treating certain tribal medical personnel as employees of the U.S. Public Health Service], 42 U.S.C. § 233(a) [providing that the exclusive remedy for certain damages caused by employees of the U.S. Public Health Service is against the United States].) None of the respondents here, however, allege that they are immune from suit under any statute.

II

*Sovereign Immunity*

With that background in mind, we consider first whether respondents are, as they allege, entitled to sovereign immunity. We find they are not.

Acres seeks in his suit to recover damages from respondents in their personal capacities. He alleges that each of the respondents committed one or more torts against

11

him and, to address these alleged wrongs, he seeks monetary relief from them directly. These claims may lack merit, and they may even be barred under personal immunity principles. But they are not barred by the Tribe's sovereign immunity. As the Supreme Court explained in *Alden v. Maine* (1999) 527 U.S. 706 (*Alden*) in discussing state sovereign immunity, "a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally." (*Id.* at p. 757.) And as the court recently reaffirmed in *Lewis* in discussing tribal sovereign immunity, which is "no broader than the protection offered by state or federal sovereign immunity," "sovereign immunity 'does not erect a barrier against suits to impose individual and personal liability.' " (*Lewis, supra*, 137 S.Ct. at pp. 1292-1293.) Applying those principles to this case, we cannot conclude that sovereign immunity principles bar Acres's suit. Any judgment against these respondents, after all, would not obligate the Tribe or the Casino to pay the relief Acres seeks. It would only obligate the individual respondents to pay the requested damages out of their own pockets.

Respondents never characterize Acres's suit differently. They instead, quoting the trial court, principally contend *Lewis* is distinguishable for three reasons. But we find none of their arguments favor a different result.

First, they assert, " 'the alleged tort in *Lewis* occurred entirely on state land in pursuit of the tribe's commercial activities, while the malicious prosecution claim and related torts here occurred entirely on tribal land within the context of a Tribal Court judicial proceeding.' " But that distinction is largely irrelevant. A tribe's immunity, after all, is not limited to the tribe's activities on tribal lands; it extends "even when they take place off Indian lands." (*Michigan v. Bay Mills Indian Community, supra*, 572 U.S. at p. 790.) The critical question for our purposes, thus, has little to do with the location where the tribal conduct occurred. It instead, as the Supreme Court explained in *Lewis*,

12

focuses on "who may be legally bound by the court's adverse judgment." (*Lewis, supra*, 137 S.Ct. at pp. 1292-1294.) And, again, because neither the Tribe nor the Casino would be bound by any potential adverse judgment in this case, we decline to find sovereign immunity applicable.

Second, respondents contend, " 'the tribe's driver in *Lewis* did not claim to be an "official" of the tribe acting as the tribe's necessary fiduciary agent, while the Tribe's Tribal Court Judge, Clerk, Executives and attorneys in this matter were officials of Tribe in the Tribal Court, or officials providing legal representation to the Tribe.' " Respondents suggest, in this argument, that a tribe's high-level officials and attorneys are entitled to sovereign immunity as of right, even if low-level employees are not.

But the Supreme Court has never equated a sovereign's high-ranking officials or attorneys with the sovereign itself. Consider, for example, *Hafer v. Melo* (1991) 502 U.S. 21 (*Hafer*). In that case, after the auditor general of Pennsylvania fired certain employees following her election, several employees alleged they were fired "because of their Democratic political affiliation" and filed suit seeking, among other things, damages from the auditor general in her personal capacity. (*Id.* at p. 23.) Claiming immunity, the auditor general responded that the suit should be barred under the Eleventh Amendment because "imposing personal liability on officeholders may infringe on state sovereignty by rendering government less effective." (*Id.* at p. 29; see also *Alden*, *supra*, 527 U.S. at pp. 728-729 ["The Eleventh Amendment confirmed rather than established sovereign immunity [for the states] as a constitutional principle"].) But the Supreme Court rejected her argument.

Although the court accepted that the auditor general took the challenged actions in her "official capacit[y]" (*Hafer, supra*, 502 U.S. at p. 24), and although it noted that "[s]uits against state officials in their official capacity . . . should be treated as suits against the State" (*id.* at p. 25), the court nonetheless found her argument misplaced. "[T]he phrase 'acting in their official capacities,' " the court explained, "is best

13

understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." (*Id.* at p. 26.) And because, in this case, the auditor general was sued in her personal capacity, even if she acted in her official capacity, she could not rely on the state's sovereign immunity as a shield. (*Id.* at p. 31 ["Insofar as respondents seek damages against [the auditor general] personally, the Eleventh Amendment does not restrict their ability to sue in federal court"].) "[I]mposing personal liability on state officers," the court added, "may hamper their performance of public duties. But such concerns are properly addressed within the framework of our personal immunity jurisprudence." (*Id.* at pp. 30-31.)

The court's earlier decision in *Spalding v. Vilas* (1896) 161 U.S. 483 (*Spalding*) is similar. The court there considered the immunity available to the United States Postmaster General in a suit for damages based on his official actions—which were neither "unauthorized by law, nor beyond the scope of his official duties"—that were allegedly motivated by personal malice. (*Id.* at pp. 493-499.) Although a high-ranking official acting consistent with his duties, the court never considered whether the Postmaster General was entitled to sovereign immunity for his conduct. It instead considered only whether he was entitled to personal immunity—a type of immunity, notably, that would not have been available had he been able to assert sovereign immunity, as an official may only raise sovereign immunity defenses, not personal immunity defenses, in suits deemed to be effectively against the sovereign. (*Graham, supra*, 473 U.S. at p. 167 ["[i]n an official-capacity action, [personal immunity] defenses are unavailable"; "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess"].) Drawing on principles of personal immunity developed in English cases at common law, the court concluded that "[t]he interests of the people" required a grant of absolute immunity. (*Spalding*, at pp. 498-499.) It reasoned that, "[i]n exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should

14

not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages.  It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint." (*Id.* at p. 498.)

Perhaps respondents here could raise similar arguments for their own personal immunity.  But to the extent they believe their status as high-ranking officials or attorneys entitles them to sovereign immunity as of right, they are mistaken.  As the Supreme Court has repeatedly made clear, "[i]n deciding whether an action is in reality one against the Government, the identity of the named parties defendant is not controlling; the dispositive inquiry is 'who will pay the judgment?' " (*Stafford v. Briggs* (1980) 444 U.S. 527, 542, fn. 10.)  Consistent with those principles, the state auditor general in *Hafer* was not entitled to sovereign immunity even though she was a high-ranking elected official.  Nor was the Postmaster General in *Spalding* even though he too was a high-ranking official.  He was instead entitled only to personal immunity—a type of immunity, again, that he could not have successfully asserted had he been able to seek immunity on the separate ground of sovereign immunity.  (See *Graham, supra*, 473 U.S. at pp. 166-167.)

Lastly, in attempting to distinguish *Lewis*, respondents argue that " 'the negligence action against the driver in *Lewis* would not be expected to require the appearance of the Tribe (or tribal officials) as witnesses or necessary parties in the action, while the malicious prosecution claim would most likely require action by the Tribe in the lawsuit and could involve efforts to invade the privileged interactions between the Tribe and its legal counsel regarding the decision-making process underlying the prosecution of Acres in the Tribal Court.' "

We acknowledge these are legitimate concerns, though they are perhaps somewhat overstated.  We fail to see, for example, why the Tribe—which presumably retains its

sovereign immunity—would need to participate in Acres's action. We also question at this stage whether Acres could, as respondents fear, "invade the privileged interactions between the Tribe and its legal counsel." The mere filing of a malicious prosecution action, after all, does not " 'automatically open an attorney's files.' " (*Schlumberger Limited v. Superior Court* (1981) 115 Cal.App.3d 386, 393 [" 'If filing a malicious prosecution action (or, by the same logic, a malpractice action) could automatically open an attorney's files to a prior action, then an attorney, anticipating such a future suit, would hesitate to commit his or her doubts about a case to paper.' "]; see also *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1262 [although a party may overcome the attorney-client privilege by "mak[ing] a prima facie showing that the services of the lawyer 'were sought or obtained' to enable or to aid anyone to commit or plan to commit a crime or fraud," the "mere assertion of fraud is insufficient; there must be a showing the fraud has some foundation in fact"].)

But setting that aside, we agree *Lewis* is distinguishable for some of the reasons respondents suggest. In contrast to the suit in *Lewis*, for instance, allowing Acres's suit to go forward would likely require some tribal employees to testify in the action and could distract these employees from their official duties. But considering other immunity cases involving outside counsel, we find respondents' stated concerns "are properly addressed within the framework of [the Supreme Court's] personal immunity jurisprudence," not its sovereign immunity jurisprudence. (*Hafer, supra*, 502 U.S. at p. 31.)

The Supreme Court in *Filarsky v. Delia* (2012) 566 U.S. 377, 391 (*Filarsky*), for example, relied on personal immunity principles to address concerns nearly identical to respondents' own. In that case, a city hired a private employment attorney to assist in the investigation of an employee who allegedly misused his sick time, and the investigated employee later sued the attorney (and various others) for conducting an unconstitutional search during the investigation. (*Id.* at pp. 380-382.) In the course of finding the attorney

16

was entitled to personal immunity, the court noted that allowing the suit to go forward would likely require several city employees who worked with the attorney to testify as witnesses and "embroil[]" the city's employees in the litigation. (*Id.* at p. 391.) Because of those considerations, which largely parallel respondents' own concerns, the court concluded that allowing the suit to proceed would distract these city's employees from their duties and thus "substantially undermine an important reason [personal] immunity is accorded public employees in the first place." (*Ibid.*)

The Ninth Circuit in *Davis v. Littell* (9th Cir. 1968) 398 F.2d 83 (*Davis*), found similarly on facts more like our own. The court there considered "whether appellee, by virtue of his position as [outside] counsel for the Navajo Tribe, was entitled to assert absolute privilege as to defamatory statements made by him within the scope of his official duties." (*Id.* at p. 83.) Relying on case law concerning personal immunity, not sovereign immunity, it found he was. Echoing the sentiments of the *Spalding* court, the Ninth Circuit reasoned that personal immunity was necessary to eliminate "the 'constant dread of retaliation' for injury committed in the course of duty" and to allow " 'unflinching discharge of (official) duties' free from the threat of suit and charge of malice." (*Id.* at p. 85.) The court found support for its conclusion in *Spalding*, *Barr v. Matteo* (1959) 360 U.S. 564, and *Gregoire v. Biddle* (2d Cir. 1949) 177 F.2d 579—all cases, notably, involving personal immunity. (*Davis*, at pp. 84-85; see also *Barr*, at pp. 574-575 (plurality opinion) ["Acting Director of an important agency of government" found entitled to personal immunity against a libel claim based on a press release issued "in the line of duty"]; *Gregoire*, at pp. 579-581 ["two successive Attorneys-General of the United States, two successive Directors of the Enemy Alien Control Unit of the Department of Justice, and the District Director of Immigration at Ellis Island" found entitled to personal immunity against a claim of malicious arrest].)

Beyond attempting to distinguish *Lewis*, respondents also contend other case law favors their position. First, citing *Brown v. Garcia* (2017) 17 Cal.App.5th 1198,

17

respondents claim "a Tribe's sovereign immunity extends 'to tribal officials when they act in their official capacity and within the scope of their authority.' " But to the extent the court in *Brown* endorsed that view, we disagree with it. As the Supreme Court in *Lewis* explained, a tribal employee is not entitled to sovereign immunity "solely because he was acting within the scope of his employment." (*Lewis, supra*, 137 S.Ct. at pp. 1292-1293.) Nor, similarly, is an employee entitled to sovereign immunity merely because she inflicted the alleged injury in her official capacity. (*Hafer, supra*, 502 U.S. at p. 26 ["the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury"; see also *Spalding, supra*, 161 U.S. at p. 498].) Nor, finally, is an official entitled to sovereign immunity simply because he holds an important title or position. (*Spalding, supra*, 161 U.S. at p. 493.) Instead, the "dispositive inquiry" for our purposes is only this: " 'who will pay the judgment?' " (*Stafford v. Briggs, supra*, 444 U.S. at p. 542, fn. 10.) And again, because any judgment in Acres's favor would operate only against respondents in their individual capacities, and not against the Tribe or the Casino, we find Acres's suit is not barred by the Tribe's sovereign immunity.

Next, respondents contend their position "is consistent with the Ninth Circuit's decision in *Maxwell v. San Diego County* (9th Cir. 2013) 708 F.3d 1075." That is so, they reason, because the court there cautioned that "we must be sensitive to whether 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the [sovereign] from acting, or to compel it to act.' " (*Id.* at p. 1088.) Focusing on the "interfere with the public administration" language, respondents argue that tribal counsel "must be free to express legal opinions and give advice unimpeded by fear their relationship with the Tribe will be exposed to examination and potential liability for the advices and opinions given."

18

But although a constant fear of suit may leave public officials unduly timid in performing their duties and, in this sense, indirectly interfere with public administration, this consideration does not weigh in favor of granting sovereign immunity. It weighs instead, if anything, in favor of granting personal immunity. As the Supreme Court explained in *Westfall v. Erwin* (1988) 484 U.S. 292, superseded by statute on other grounds as stated in *Hernandez v. Mesa* (2020) 140 S.Ct. 735, 748, the "provision of [personal] immunity rests on the view that the threat of liability will make federal officials unduly timid in carrying out their official duties, and that effective government will be promoted if officials are freed of the costs of vexatious and often frivolous damages suits." (*Westfall*, at p. 295.) Those are precisely the types of concerns that respondents assert here. Respondents thus, once again, raise concerns better addressed within the framework of the Supreme Court's personal immunity jurisprudence, not its sovereign immunity jurisprudence.

To find otherwise, and to treat any alleged indirect interference of this sort as enough to trigger sovereign immunity, would largely eviscerate the distinction between sovereign immunity and personal immunity and render questionable a long line of Supreme Court decisions dealing with personal immunity. A judgment against the Postmaster General in *Spalding*, for instance, would have left him (and other federal officials) "under an apprehension that the motives that control [their] official conduct may, at any time, become the subject of inquiry in a civil suit for damages," "seriously crippl[ing] the proper and effective administration of public affairs." (*Spalding, supra*, 161 U.S. at p. 498.) But that threatened "cripp[ling]" interference with public administration was not ground for finding sovereign immunity applicable; it was ground instead for finding the action barred by absolute personal immunity. (*Id.* at pp. 498-499; see also *Hafer, supra*, 502 U.S. at p. 31.)

Respondents next point to *Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407 (*Morongo Band of Mission Indians*) as

19

supportive authority. That case, we agree, lends some support to their position. The plaintiff there, a casino company, sued an Indian tribe, its tribal council, the individual tribal council members, numerous individual tribal members, and the tribe's in-house and outside counsel, alleging that the defendants "concoct[ed] a fraudulent scheme to cancel" a contract that authorized the plaintiff to operate a gambling enterprise on the tribe's reservation. (*Id.* at pp. 1411-1414.) But, the court found, all the individual defendants (along with the tribe) were protected by sovereign immunity. (*Id.* at p. 1421.) In terms of the in-house and outside counsel, the court concluded the attorneys were immune under the reasoning of the Ninth Circuit in *Davis*. (*Id.* at p. 1424.) But *Davis*, again, found a tribe's general counsel was entitled to personal immunity, not sovereign immunity. (*Davis, supra*, 398 F.2d at p. 85.) And so, in relying on *Davis* to find the tribe's attorneys were "covered by the tribe's sovereign immunity" (*Morongo Band of Mission Indians*, at p. 1424), the *Morongo Band of Mission Indians* court, in our view, misconstrued the *Davis* decision and improperly conflated sovereign immunity with personal immunity.

Finally, the Janssen Malloy respondents assert that allowing Acres's claim to proceed would impermissibly impinge on the Tribe's sovereignty because it "would compel the state court to determine what actions are permissible in Tribal Court; whether the Tribal Court has followed its own procedures in Tribal Court; and whether an attorney in Tribal Court has misused the Tribal Court's judicial process." Aspects of his claim, we accept, have some truth. We accept, for example, that resolving whether the Casino's tribal suit against Acres "was brought without objective probable cause"— which is one of the elements for malicious prosecution of a civil lawsuit (*Lane v. Bell* (2018) 20 Cal.App.5th 61, 64)—could require some consideration of tribal law. But we decline to find that respondents are entitled to sovereign immunity for that reason. The fundamental flaw with respondents' argument is that it has nothing to do with the identity of the defendant. A simple example illustrates the point. Suppose a person having no

20

association with the Tribe filed a frivolous suit in tribal court. And suppose the sued party, in response, filed a suit for malicious prosecution in state court. Under respondents' logic, the filer of the tribal suit could claim that the state suit is barred by sovereign immunity because resolving the claim "would compel the state court to determine what actions are permissible in Tribal Court." We decline to accept this reasoning, which finds no support in the Supreme Court's sovereign immunity jurisprudence and which would grant sovereign immunity to persons having no relation to a sovereign entity.

In sum, although respondents may ultimately prevail on a claim of personal immunity, we decline to find that they are entitled to sovereign immunity. Our conclusion in this respect accords with the Ninth Circuit's recent decision in *Acres Bonusing, Inc v. Marston* (9th Cir., Nov. 5, 2021) 2021 WL 5144701 (*Acres Bonusing*). Again, shortly after Acres sued respondents in state court, Acres and Acres Bonusing filed a "substantially similar" action in federal district court. (*Acres Bonusing, supra*, 2020 WL 1877711 at p. *2.) But, like the trial court in this case, the district court found Acres's claims barred by sovereign immunity. The court reasoned, in summary, "that all of the defendants were functioning as the Tribe's officials or agents when the alleged acts were committed" and so were entitled to tribal sovereign immunity. (*Id.* at p. *4.) The Ninth Circuit, however, rejected the district court's sovereign immunity analysis. It reasoned: "Acres and [Acres Bonusing] seek money damages against the defendants in their individual capacities. Any relief ordered by the district court will not require Blue Lake to do or pay anything. Because any 'judgment will not operate against the Tribe,' [citation], Blue Lake is not the real party in interest, and tribal sovereign immunity does not apply." (*Acres Bonusing, supra*, 2021 WL 5144701 at p. *7.) For the reasons discussed, we find likewise here.

III

*Personal Immunity*

A. *Judicial and Quasi-Judicial Immunity*

Having rejected respondents' assertion of sovereign immunity, we consider next whether certain respondents are entitled to judicial or quasi-judicial immunity—a type of absolute personal immunity. Seven of the respondents—namely, one of the Casino officials (Ramsey), the tribal court clerk (Huff), the tribal court judge (Judge Marston), and four attorneys associated with Rapport and Marston (DeMarse, Burrell, Vaughn, and Lathouris)—raise this defense. Apart from Ramsey, we find these respondents are entitled to judicial or quasi-judicial immunity.

1. *Judge Marston, Huff, DeMarse, Burrell, Vaughn, and Lathouris*

We start with Judge Marston, Huff, DeMarse, Burrell, Vaughn, and Lathouris.

"As early as 1872, the [Supreme] Court recognized that it was 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself.' " (*Stump v. Sparkman* (1978) 435 U.S. 349, 355 (*Stump*).) For that reason, the court has explained, " 'judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts' " and "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." (*Id.* at pp. 355-356.) "[R]ather," the court went on, a judge "will be subject to liability only when he has acted in the 'clear absence of all jurisdiction' " or outside "his 'judicial' capacity." (*Id.* at pp. 356-357, 360; see also *Penn v. United States* (8th Cir. 2003) 335 F.3d 786, 789 ["a tribal court judge is entitled to the same absolute judicial immunity that shields state and federal court judges"].)

Apart from protecting judges, the Supreme Court has added, this immunity also extends to "certain others who perform functions closely associated with the judicial

22

process." (*Cleavinger v. Saxner* (1985) 474 U.S. 193, 200 ; see also *Antoine v. Byers & Anderson, Inc.* (1993) 508 U.S. 429, 436.)  California courts have found similarly. (*Hardy v. Vial* (1957) 48 Cal.2d 577, 582 (*Hardy*) [California "recognize[s] the same wide immunity" for judges and certain other officials]; *Howard v. Drapkin* (1990) 222 Cal.App.3d 843, 852-853 ["California courts have extended absolute judicial immunity to persons other than judges if those persons act in a judicial or quasi-judicial capacity"].)

In this case, as relevant here, Acres has sued a tribal court judge, several attorneys who effectively served as his law clerks, and a tribal court clerk in connection with their work in *Blue Lake v. Acres Bonusing*.  We find all are entitled to judicial or quasi-judicial immunity.

Starting with Judge Marston, although we accept he had a conflict of interest, we find he still acted in his capacity as a judge, and not " 'clear[ly] [in] absence of all jurisdiction,' " when he presided over *Blue Lake v. Acres Bonusing*.  (See *Montana v. United States* (1981) 450 U.S. 544, 565 ["Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations," including non-Indians "who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"].)  We find he is thus entitled to judicial immunity for his alleged conduct.  (*Stump, supra*, 435 U.S. at pp. 355-356 [judges " 'are not liable to civil actions for their judicial acts, even when such acts . . . are alleged to have been done maliciously or corruptly' "].)

Turning next to his, in effect, law clerks (DeMarse, Burrell, Vaughn, and Lathouris), we find they also are entitled to immunity for the assistance they offered Judge Marston in *Blue Lake v. Acres Bonusing*.  The Supreme Court, again, has extended the immunity granted to judges to "certain others who perform functions closely associated with the judicial process," including, among others, prosecutors, grand jurors, and testifying witnesses.  (*Cleavinger v. Saxner, supra*, 474 U.S. at p. 200; see also

*Howard v. Drapkin, supra*, 222 Cal.App.3d at pp. 852-853 [California courts have found similarly].) Although it has yet to consider the immunity of law clerks, we have no trouble concluding that law clerks too "perform functions closely associated with the judicial process." Several federal courts of appeals, indeed, have already found as much. As the Second Circuit has explained, "a law clerk is probably the one participant in the judicial process whose duties and responsibilities are most intimately connected with the judge's own exercise of the judicial function." (*Oliva v. Heller* (2d Cir. 1988) 839 F.2d 37, 40.) For that reason, the court concluded, "we therefore must agree that 'for purposes of absolute judicial immunity, judges and their law clerks are as one.' " (*Ibid.*; *Moore v. Brewster* (9th Cir. 1996) 96 F.3d 1240, 1244-1245 (*Moore*) [same], superseded by statute on other grounds as recognized in *Dettamanti v. Staffel* (9th Cir. 2020) 793 Fed.Appx. 583.) We find likewise here.

Finally, considering the clerk of the court (Huff), we find she too is entitled to immunity. Although not entirely clear, Acres's complaint appears to challenge certain discretionary acts that Huff took in the course of *Blue Lake v. Acres Bonusing*. Acres suggests, for example, that "Clerk Huff used her discretion" to apply the tribal court's rules of court too stringently against him. But discretionary acts of that sort, involving the application of court rules to the facts, are judicial in nature and protected by absolute immunity. (*Moore, supra*, 96 F.3d at pp. 1244-1245 [court clerk entitled to absolute immunity for his quasi-judicial acts]; *Scott v. Dixon* (11th Cir. 1983) 720 F.2d 1542, 1546 [court clerk entitled to absolute immunity for acts of a type "normally handled by a judge"].)

Attempting to overcome respondents' entitlement to judicial or quasi-judicial immunity, Acres offers several arguments that Judge Marston, Huff, DeMarse, Burrell, Vaughn, and Lathouris acted outside of their judicial or quasi-judicial capacities. But we find none of his arguments persuasive.

First, Acres contends Judge Marston, Burrell, Vaughn, Lathouris, and DeMarse acted outside their judicial or quasi-judicial capacities when they advised the Casino, the Tribe, and Ramsey on certain legal matters while Judge Marston was presiding over *Blue Lake v. Acres Bonusing*. In support, he cites portions of his complaint where he alleged these respondents advised the Casino, the Tribe, and Ramsey on employment issues, domestic restraining orders, "the legality of arming tribal employees," "gaming compact litigation," and a suit involving the California Department of Motor Vehicles titled *Blue Lake v. Shiomoto*. But Acres has not alleged that he was harmed simply because these respondents provided legal advice on these topics. He has not alleged, for example, that respondents' advising the Tribe on "gaming compact litigation" somehow caused him to suffer any harm. He has instead alleged that he was harmed because Judge Marston, with the help of these four attorneys, presided over *Blue Lake v. Acres Bonusing* even though he and his assistants had a conflict of interest and a corrupt intent to rule against him. But although we agree that a judge's presiding over a case while having a conflict of interest and corrupt intent is certainly objectionable, a judge has not acted outside of his or her judicial capacity in that scenario. (See *Stump, supra*, 43 U.S. at pp. 355-356 [judges " 'are not liable to civil actions for their judicial acts, even when such acts . . . are alleged to have been done maliciously or corruptly' "]; *Moore, supra*, 96 F.3d at pp. 1242, 1244-45 [federal judge, law clerk, and clerk of the court who allegedly conspired "to deprive [a litigant] of the proceeds of a judgment in his favor" were immune from suit].)

Second, Acres argues that Judge Marston acted outside his judicial capacity when "he decided to employ Vaughn, Burrell, and Lathouris as contractors to aid him in presiding over *Blue Lake v. Acres* [*Bonusing*]." But even if that is true, it is irrelevant for our purposes. Acres, after all, has not sued Judge Marston because he employed Vaughn, Burrell, and Lathouris.

25

Third, Acres claims that Judge Marston acted outside his judicial capacity when he "assigned *Blue Lake v. Acres* [*Bonusing*] to himself." In his view, this was a ministerial, not a judicial act, and ministerial acts are not entitled to judicial immunity. We acknowledge that "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. In *Ex parte Virginia,* 100 U.S. 339 (1880), for example, th[e Supreme] Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts." (*Forrester v. White* (1988) 484 U.S. 219, 228.) The court reasoned that "[w]hether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent," and "[t]he duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge." (*Ex parte Virginia*, at p. 348.) But even supposing Judge Marston's assigning *Blue Lake v. Acres Bonusing* to himself was an administrative, not a judicial, act, we do not see how that helps Acres. Acres never alleged nor suggested that he suffered any harm from Judge Marston's mere assignment of the case. He alleged instead that he suffered harm because Judge Marston presided over *Blue Lake v. Acres Bonusing* even though he had a conflict of interest and a corrupt intent. But again, as to that conduct, we find Judge Marston plainly acted in his judicial capacity, even if inappropriately. (See *Dennis v. Sparks* (1980) 449 U.S. 24, 28-29 (*Dennis*) [judge who was allegedly bribed to rule against a litigant was immune from damages liability]; see also *In re Castillo* (9th Cir. 2002) 297 F.3d 940, 952 ["when determining whether a function is judicial in nature, a court must focus on the 'ultimate act' rather than the constituent parts of the act"].)

Fourth, Acres asserts that Huff acted outside her quasi-judicial capacity when she processed Judge Marston's and his assistants' invoices relating to *Blue Lake v. Acres Bonusing*. He also alleges that Huff's obligations include "generating revenue for [the Casino]." But similar to above, even supposing all that is true, Acres never alleged that

26

he suffered any harm from these activities, and so we fail to see the relevance of Acres's contentions. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

Fifth, Acres argues that Burrell, Vaughn, Lathouris, and DeMarse are barred from claiming judicial or quasi-judicial immunity because they also claimed prosecutorial immunity. But Acres neither explains his logic nor cites any supportive authority for his position. We find his argument forfeited as a result. (*Badie v. Bank of America, supra*, 67 Cal.App.4th at pp. 784-785.) In any event, to the extent Acres believes these respondents have raised conflicting immunity defenses, we disagree. These respondents have raised both judicial and prosecutorial immunity, it appears, because they believe Acres has challenged their conduct in their judicial capacity (in their capacity as, in effect, law clerks to Judge Marston) and in their prosecutorial capacity (in their capacity as the Casino's counsel).

Lastly, Acres asserts that those respondents who corruptly conspired with Judge Marston are not entitled to judicial immunity, even if Judge Marston is. Acres bases his argument on the Supreme Court's decision in *Dennis*, which found that private litigants who allegedly bribed a judge could be liable for their conduct under 42 United States Code section 1983 even though the judge was immune. (*Dennis, supra*, 449 U.S. at pp. 28-29.) As the court noted, these litigants "urg[ed] dismissal for failure to allege action 'under color' of state law, a necessary component of a § 1983 cause of action." (*Id.* at p. 26.) They reasoned that, because they are private individuals rather than state officials, they could not act "under color" of state law. (*Ibid.*) But the court disagreed. It reasoned that "to act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983

27

actions." (*Id.* at pp. 27-28.) None of this reasoning helps Acres, however. *Dennis* does not, as Acres appears to believe, supply a rationale for overcoming judicial or quasi-judicial immunity. Indeed, the one party in the case who could claim judicial immunity, the judge, remained immune from suit. We thus fail to see how the case assists Acres in his efforts to overcome the judicial or quasi-judicial immunity of Huff, DeMarse, Burrell, Vaughn, and Lathouris.

We therefore conclude that Judge Marston, Huff, DeMarse, Burrell, Vaughn, and Lathouris are all entitled to absolute personal immunity. Our decision in this regard, like our conclusion concerning sovereign immunity, accords with the Ninth Circuit's decision in *Acres Bonusing*. (See *Acres Bonusing, supra*, 2021 WL 5144701 at p. *12 [Judge Marston, Huff, Burrell, DeMarse, Vaughn, and Lathouris found entitled to absolute immunity].)

### 2. *Ramsey*

We consider next the alleged judicial immunity of Ramsey.

Respondents never clearly explain why Ramsey is entitled to judicial immunity, other than to note that she is an associate judge of the tribal court. But a person is not entitled to judicial immunity merely because she happens to be a judge. "It is only for acts performed in h[er] 'judicial' capacity that a judge is absolutely immune." (*Stump, supra*, 435 U.S. at p. 360.) And to the extent respondents attempt to characterize Acres's claims against Ramsey as involving acts performed in her judicial capacity, we reject that contention. As Ramsey herself said in her declaration, she "did not perform any judicial duties in connection with the Tribal Court action entitled *Blue Lake Rancheria Casino and Hotel v. Acres*." Acres does not appear to allege any differently in his complaint.

In the end, Ramsey may be entitled to another form of personal immunity in this action. But respondents have not shown that she is entitled to judicial immunity. (See *Acres Bonusing, supra*, 2021 WL 5144701 at p. *13 [reaching the same conclusion after

respondents conceded that Ramsey "would not be entitled to judicial or quasi-judicial immunity"].)

B. *Prosecutorial and Similar Immunity for Government Attorneys*

Finally, we consider whether certain respondents are entitled to prosecutorial or similar immunity for their alleged legal work on behalf of the Casino in its suit against Acres. Six of the respondents—namely, Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris—raise this defense. We agree these respondents are entitled to immunity.

Courts have long found that government attorneys may be entitled to absolute immunity for their work "closely associated with the judicial process" (*Burns v. Reed* (1991) 500 U.S. 478, 495)—an immunity that courts have at times characterized "as a form of 'quasi-judicial' immunity . . . derivative of the immunity of judges" (*Imbler v. Pachtman* (1976) 424 U.S. 409, 420 (*Imbler*)). Courts have typically, though not always, done so when government attorneys act in a prosecutorial capacity. In *Yaselli v. Goff* (1927) 275 U.S. 503, for example, the Supreme Court summarily affirmed a lower court decision that found federal prosecutors are immune from suits for malicious prosecution. (*Id.* at p. 503; see *Yaselli v. Goff* (2d Cir. 1926) 12 F.2d 396, 404.)

Fifty years later, in *Imbler*, the court reaffirmed that holding in a case involving a suit against a California prosecutor who allegedly conspired with others to charge and convict the plaintiff. Although acknowledging "this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty" (*Imbler, supra*, 424 U.S. at p. 427), the court found several considerations weighed in favor of granting absolute immunity. First, the court noted the long history of courts granting common law immunity to prosecutors. (*Id.* at pp. 421-424.) Second, the court found "the alternative of qualifying a prosecutor's immunity would disserve the broader public interest." (*Id.* at p. 427.) Among other things, the court explained, "[i]t would prevent the vigorous and fearless performance of

29

the prosecutor's duty that is essential to the proper functioning of the criminal justice system." (*Id.* at pp. 424-428.)  Finally, the court found various procedural safeguards—including "the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies"—would prevent abuses of authority from going unaddressed.  (*Id.* at p. 427.)  These considerations in mind, the court found it better " 'in the end . . . to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.' "  (*Id.* at p. 428; but see *Buckley v. Fitzsimmons, supra*, 509 U.S. at p. 273 ["A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity"].)

A couple years after *Imbler*, the Supreme Court found "agency officials performing certain functions analogous to those of a prosecutor"—for example, officials who "initiate administrative proceedings against an individual or corporation"—should similarly "be able to claim absolute immunity with respect to such acts."  (*Butz v. Economou* (1978) 438 U.S. 478, 515 (*Butz*).)  After expressing concern that "[a]n individual targeted by an administrative proceeding will react angrily and . . . seek vengeance in the courts," the court explained "that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment" and found that several procedural safeguards, including potential court review, adequately protect the interests of those subject to administrative actions.  (*Id.* at pp. 515-516; see also *id.* at p. 517.)

The California Supreme Court has found similarly, finding that public officers who initiate and pursue administrative and judicial proceedings within the scope of their duties, even if maliciously, are entitled to absolute immunity.  In *Hardy, supra*, 48 Cal.2d 577, for example, the court found several college and state officials, who allegedly conspired to improperly initiate an administrative proceeding against a college professor,

30

were immune from civil liability in a suit for malicious prosecution. (*Id.* at pp. 580-584.) The court reasoned that all these officials had acted within the general scope of their duties, which included the disciplining of professors, and then found, like the court in *Imbler*, that it is better " 'in the end . . . to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.' " (*Id.* at p. 583; see also *White v. Towers* (1951) 37 Cal.2d 727, 729 [agency investigator, who had the duty to investigate crime and to institute criminal proceedings, was immune from civil liability for malicious prosecution of a criminal action]; but see *Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 756 ["California law regarding the presence or absence of governmental immunity for false arrest and malicious prosecution" is now—as to employees of California, its political subdivisions, and its public corporations—"governed by statute," namely, Gov. Code, § 821.6].)

Under this and similar authority, we find Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris are all entitled to absolute immunity for their alleged legal work on behalf of the Casino. Three general considerations guide our decision. First, although Acres argues otherwise, we find historical support for applying immunity in this context. To quote the Second Circuit in *Barrett v. United States* (2d Cir. 1986) 798 F.2d 565—which found an attorney who defended the State of New York in a civil suit was entitled to absolute immunity—"[e]xten[ding] . . . absolute immunity to . . . government litigators [outside the traditional prosecutorial context] finds common law and historical support in the broader principle that 'the immunity which is extended to the judges is in like manner extended to the attorneys in the presentation of a client's case to the court or the jury.' " (*Id.* at p. 572; see also *Mangiafico v. Blumenthal* (2d Cir. 2006) 471 F.3d 391, 396 [government attorneys are entitled to absolute immunity for their conduct " 'that can fairly be characterized as closely associated with the conduct of litigation or potential litigation' in civil suits"]; *Davis, supra*, 398 F.2d at p. 85 [tribe's

31

outside counsel who made "defamatory statements made by him within the scope of his official duties" found entitled to absolute immunity].)

Second, we find an alternative rule would leave tribal attorneys unduly timid in the performance of their duties and disserve the public interest. Contractual disputes, like the one before us, often arouse intense feelings in the litigants and may lead to retaliatory suits by angry litigants. (See *Butz, supra*, 438 U.S. at p. 515.) Tribal attorneys considering whether to move forward with a suit of this sort on the tribe's behalf "should not be inhibited in the faithful performance of [their] duties by the threat of harassing lawsuits against [them]." (*Barrett v. United States, supra*, 798 F.2d at p. 572; see also *Hardy, supra*, 48 Cal.2d at pp. 582-583 [" 'to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties' "].)

Finally, we note that litigants have opportunity to challenge the legality of a suit against them in tribal court. Although we acknowledge Judge Marston's conflict of interest in this case, litigants typically may present their arguments to an impartial judge in tribal court. The tribal court rules here, indeed, expressly acknowledge a litigant's right to an impartial judge. (Tribe Ord., No. 07-01, tit. 11, art. 1, ch. 1, § 11.1.1.040.E.1. ["No judge shall be qualified to hear any case where (1) she/he has any direct interest, (2) any party involved in the case includes a relative by marriage or blood in the first or second degree, (3) for any other reason the judge cannot be impartial; or ( 4) the judge finds that a reasonable person would believe that he or she could not be impartial"].) Should, moreover, litigants in tribal court find the court has wrongly asserted jurisdiction over them, they may challenge the tribal court's jurisdiction in federal court. (*Nevada v. Hicks* (2001) 533 U.S. 353, 368.) Acres, in fact, did just that. He obtained federal court review that allowed "limited discovery" to determine whether the tribal court asserted jurisdiction in "bad faith." (*Acres II, supra*, 2017 WL 733114, at pp. *1, *3.)

Taking all these considerations together, and considering other cases that have long found immunity appropriate under similar circumstances (see *Davis, supra,* 398 F.2d at p. 85), we find absolute immunity appropriate here.

Although Acres offers several arguments in favor of a contrary result, we find none of his arguments persuasive. First, without any citation or explanation, he contends "[n]o Respondent can enjoy prosecutorial immunity because *Blue Lake v. Acres* [*Bonusing*] was not a criminal proceeding." Supreme Court precedent, however, forecloses the argument that government attorneys may enjoy absolute immunity only in criminal proceedings. (See *Butz, supra,* 438 U.S. at p. 515 [finding immunity in non-criminal administrative proceeding]; *Hardy, supra,* 48 Cal.2d at pp. 583-584 [same].)

Second, Acres argues that respondents are not entitled to immunity because "Indian tribes lack criminal jurisdiction over non-Indians." But although we acknowledge that "Indian tribes do not have inherent jurisdiction to try and to punish non-Indians" (*Oliphant v. Suquamish Indian Tribe* (1978) 435 U.S. 191, 212), we fail to see the relevance of that detail. As Acres himself acknowledges, *Blue Lake v. Acres Bonusing* was not a criminal proceeding.

Third, Acres argues that respondents cannot seek immunity under Government Code section 821.6—a statute granting immunity to certain public officials for malicious prosecution. That statute, in particular, provides that a "public employee"—defined to mean an employee of the State of California, its political subdivisions, or its public corporations—"is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code, § 821.6; see also *id.*, §§ 811.2, 811.4.) But although true, as Acres asserts, that respondents cannot seek immunity under this statute (and they have not), they can seek support in the principles underlying the statute. Government Code section 821.6 serves in large part to codify the common law rule, recognized in cases like *Hardy*, that immunized public employees from suits for

33

malicious prosecution. (See *Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 719 [noting that, according to the Senate Committee comment to the statute, Government Code section 821.6 "continues the existing immunity of public employees" recognized in *Hardy* and similar cases].) Although the statute speaks only of employees of the State of California and related entities, the broader common law principles underlying the statute are not so limited and extend also to tribal employees. (See *Turner v. Martire* (2000) 82 Cal.App.4th 1042, 1049 ["common law immunity [extends] to tribal officials" because of "the need to protect such officials from the detrimental effect that the prospect of liability would have on their performance of their official duties"]; see also *Davis, supra*, 398 F.2d at p. 85 [tribal council found entitled to absolute immunity under common law immunity principles].)

Fourth, Acres contends we should not extend immunity to "civil litigators from private law firms acting on behalf of a for-profit commercial enterprise." Acres's contention appears to include two components: (1) only a tribe's in-house counsel can assert immunity, and (2) a tribe's counsel can only assert immunity in suits involving traditional governmental matters (as opposed to "for-profit commercial" matters). We find neither argument persuasive. To start, we reject Acres's suggestion that only a tribe's in-house counsel can assert immunity. As the Supreme Court explained in *Filarsky*, a case involving the immunity of a private attorney who a city had hired for an investigation, "[a]ffording immunity not only to public employees but also to others acting on behalf of the government" is consistent with historical practices and "serves to ' "ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service." ' " (*Filarsky, supra*, 566 U.S. at p. 390; see also *id.* at p. 387; *Davis, supra*, 398 F.2d at p. 85 ["That a tribe finds it necessary to look beyond its own membership for capable legal officers, and to contract for their services, should certainly not deprive it of the advantages of the rule of privilege otherwise available to it"].)

34

Turning next to Acres's suggestion that a tribe's counsel can only assert immunity in suits involving traditional governmental matters, we reject that contention too. In the context of sovereign immunity, the Supreme Court has not "yet drawn a distinction between governmental and commercial activities of a tribe." (*Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754-755.) It instead, for both types of activities, has found tribes enjoy sovereign immunity. (*Id.* at p. 760 ["[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities"].) Considering that sovereign immunity and personal immunity both "spring[] from the same root considerations" (*Scheuer, supra*, 416 U.S. at p. 239), we similarly decline to draw a distinction between governmental and commercial activities of a tribe in the context of personal immunity. We see no reason, after all, to treat a government attorney who files suit to enforce a traditional governmental contract different from a government attorney who files suit to enforce a commercial contract. Both attorneys, in our view, are entitled to immunity for the initiation and prosecution of the enforcement action on the government's behalf.

Fifth, in his reply brief, Acres contends Rapport and Marston, Rapport, DeMarse, Burrell, Vaughn, and Lathouris cannot, in this appeal, seek immunity for their work on the Casino's behalf, because the trial court never reached that issue and these respondents never cross-appealed the trial court's decision. We disagree. A respondent may on appeal " 'assert a legal theory which may result in affirmance of the judgment,' " even if the trial court declined to consider that theory. (*Hutchinson v. City of Sacramento* (1993) 17 Cal.App.4th 791, 798.)

Finally, also in his reply brief, Acres contends Rapport and DeMarse cannot seek immunity for their work on the Casino's behalf, because, although DeMarse "undisputed[ly]" billed the Casino for work in *Blue Lake v. Acres Bonusing*, "Rapport specifically denies that he or DeMarse provided any legal services in *Blue Lake v. Acres* [*Bonusing*]." Acres reasons that Rapport's statement shows that his and DeMarse's work

35

in *Blue Lake v. Acres Bonusing* was "non-legal in nature" and so is not protected by any immunity afforded to tribal attorneys. We reject the claim. Acres's argument is premised on a misunderstanding of the record. Start with his claim that DeMarse "undisputed[ly]" billed the Casino for work in *Blue Lake v. Acres Bonusing*. Acres suggests in this claim that DeMarse represented the Casino in the tribal litigation. But as he acknowledges elsewhere in his briefing, DeMarse served Judge Marston, not the Casino, in *Blue Lake v. Acres Bonusing*. Consider next Acres's claim that "Rapport specifically denies that he or DeMarse provided any legal services in *Blue Lake v. Acres* [*Bonusing*]." To support that claim, Acres points to Rapport's declaration. But the declaration says something quite different, stating, with regard to *Blue Lake v. Acres Bonusing*, that neither he nor DeMarse "performed any legal services for the *Tribe* in the tribal court proceedings." (Italics added.) At most, then, the record shows that (1) DeMarse assisted Judge Marston in *Blue Lake v. Acres Bonusing*, and (2) DeMarse and Rapport did not represent the Tribe in *Blue Lake v. Acres Bonusing*. But it does not show, as Acres claims, that DeMarse and Rapport provided non-legal services to the Casino in *Blue Lake v. Acres Bonusing*.

## DISPOSITION

We reverse the trial court's ruling in favor of Ramsey, Frank, Boutin Jones, Janssen Malloy, Chase, Stouder, O'Neill, Yarnall, and Burroughs. In all other respects, we affirm. The parties are to bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

_____\s\_____

Blease, Acting P. J.

We concur:

_____\s\_____

Mauro, J.

_____\s\_____

Duarte, J.